Good morning. May it please the Court, Katie O'Sullivan for the appellants, Alyeska, the plans, and the plan administrators. This case involves two ERISA plans, and the primary issue on appeal is whether the plan administrators' interpretations of those plans were reasonable. They were, and the District Court erred in second-guessing the plan administrators' interpretations. On the separation plan, the plan administrators' interpretation of the plan language was reasonable because the plan had a clear juxtaposition between regular employees, on the one hand, who were eligible for benefits, and non-Alyeska contract personnel who were not eligible. And even the District Court agreed that it was reasonable to conclude that non- I gather the bulk of the money here is in the other plan, is that right? Yes. So make sure it's worth it. Sure, absolutely, Your Honor. So on the pension plan, it was reasonable for the pension plan administrator to conclude that the definition of employee in the plan was limited to those people who were paid by Alyeska, not somebody else. And by that, you mean paid directly by Alyeska, because I guess under the common employee or the common law employee, it could be paid indirectly through a conduit. Yes, paid directly by Alyeska on the Alyeska payroll. That is how the pension plan administrator interpreted the plan. But if that's what it said, then why was it amended later to say that? It was amended later to make crystal clear that that's what it meant. And that is why the plan administrator's letters to Mr. Rankin on his appeal said, those later amendments are clarifications of what was the meaning in the text. And it is the most logical reading of paragraph 216 in that original 1989 plan, and it's certainly a reasonable reading, that who was an employee involved a basic quid pro quo, that an employee is someone who rendered personal services to the company. Which this man did for a very long time and had an office there and he was, apparently his promotions and his jobs were assigned, his promotions were assigned, his pay was determined all by Alyeska, is that right? That is what he asserts. The plan administrator nor the district court below made any factual finding or conclusion as to whether he was a common law employee and met that. I understand that. I wasn't trying to make a conclusion. I was trying to say facts. Have those facts ever been disputed as to what he did and who directed him and who made decisions about his pay and so on? They haven't been evaluated yet. So the interpretation of the plan administrator was all those facts are not relevant. The relevant facts are he was not on the payroll of Alyeska. He was not paid by Alyeska. But you were beginning from the premise that he was, that it was a common sense that he was not in fact an employee because he wasn't being paid. And you're sort of assuming the answer to the common law employee question, which, as you say, has never been decided and which you've never tried to get decided. Well, his interpretation of the plan is really an atextual interpretation. Why is that? Why that is, is he asserts that the words common law employee can be read into the plan language when it's not there. And there's nothing in ERISA that requires that a plan cover every employee. Well, the guardian seemed to say that employee for purposes of ERISA would include common law employee. And if we don't have anything that says the word employee here, it doesn't mean common law employee. And so then doesn't the plain language of that section apply to him? The answer to that is no. And a couple of responses. Darden did not say that all common law employees are eligible for ERISA benefits in every plan. So they have standing to pursue a claim. They could be employees for purposes of ERISA. They could be covered in a plan. That's right. And it depends on what the particular plan language says. So here the plan language is rendered personal services to the employer, which he did. And he also received earnings considered wages under Section 3121A, so far as we know. There was no dispute that he was receiving wages through the contractor. For earnings considered wages, for meaning in exchange for, that there was a basic quid pro quo that he was providing services to the employer in exchange for being paid by Alyeska, which he was not. Here it doesn't start there. The word for is there. Yes, for. He was paid for his personal services to the employer. He was, in fact, paid for those services. He was not paid for in the sense of exchange for by Alyeska. He was paid by third-party contract companies. Okay. So why would you have the leased employee exclusion then under your definition? Yes. That is in their leased employees are a different category within the internal revenue curve. But they would come within your, they would already be excluded by your reading of the definition of employee, right? Well, the canon of superfluity here, I think, is overridden by the canon that an ERISA plan is to be construed by a person of average intelligence, and there are certain people who know they're in that category. They're leased employees, so it's to make crystal clear that leased employees are not covered in this plan. But it's not, but you're basically agreeing it was unnecessary, you didn't need it, on your reading. Correct. To go back to this plain language of the original, the 1989 plan, which your questions have been about, there was a specific reference in that language to the tax code, the section within FICA, which deals only with payroll wages. And so that is, again, why it was reasonable for the pension plan administrator to conclude that he wasn't eligible, he wasn't on Alyeska's payroll. So by the reference to 3121A, is your suggestion that it incorporates the on-the-payroll of Alyeska? Exactly. Is there anything that supports that reading, anything else that would, in other words, that if we didn't read it that way, there would be an inconsistency in the plan? Two responses, Your Honor. One is 3121, if you look at the structure of the tax code, that is within the whole sub-chapter that covers tax on employees and deals entirely with payroll wages. So it's looking at where 3121. There's no doubt that he did get payroll wages under section 3121A of the code. So I don't see how that helps you. Not from Alyeska. That's true, but the reference to the code is whether he got wages from someone under 3121A of the code. So how does the reference to 3121A tell you anything about why it has to be from Alyeska? Where do we go to say the source has to be Alyeska? I mean, in the later changes, amendments, that's made ultimately, I think, in 2002, it's made very clear. It has to be on Alyeska's payroll, and Alyeska withholds taxes. But where do we go to get some support for that reading in 1989? You get it from the words in the 1989 plan for earnings, meaning in exchange for this quid pro quo. Right, but if he didn't work, he wouldn't have gotten paid. So I just don't see how that helps you. I mean, he worked for Alyeska. He rendered them personal services, and because he did that work, he got wages. He got the wages from another company, but I'm just not seeing how that's ruled out in that language. Well, a couple of responses. That interpretation could lead to absurd results. There are potentially all kinds of categories of people who rendered personal services to Alyeska. Let's say a cafeteria worker, computer repair guy. If they are eligible, if they've done those services for one year under that interpretation. That's what I mean by his interpretation is really. Well, then why would that be absurd? So in other words, if they're common law employees of Alyeska, and they work for a year, then they'd be under the 1989 language, under Rankings Interpretation, they would be eligible. So what about that makes it absurd? To put in there, your assumption is assuming they were common law employees. Again, that is a criteria. So if they're determined, because he hasn't been determined to be a common law employee, correct? So if they were determined to be common law employees, and Darden sets out this list of six, eight factors, whatever, then they would be entitled to benefits under this language. Why would that be absurd? Two responses. One, there's nothing in ERISA that requires every common law employee to be covered. But second, what it would mean is that the plan administrator would have no idea, at any given point in time, who is not eligible for the plan. Whereas if the plan is interpreted as those who are on the payroll, the plan administrator would have ready and easy access to who is covered. And now the plan administrator has a fiduciary obligation to all of the beneficiaries of the plan to preserve what are necessarily limited fund assets. So even if the plan administrator had a list of all of the people who were working at the plan through some of these temp employee services or whatever they are, the plan administrator would really have no way of knowing which ones were common law employees and which ones were not. And so the number of people who were eligible would be unknown. Exactly. It would require a highly fact-intensive inquiry for every individual person, and the plan administrator would have no idea who. But isn't that just necessarily true under this circuit's case law with regard to the fact that people who are not on the payroll can, in fact, be covered by the plan if they are common law employees and if the plan covers them? So it depends what the plan says. Absolutely. It depends what the plan says. Right. So the fact ñ and this plan, there may be a problem, but this plan, and it was later taken care of by later amendments. But as this is written, it seems to have been written without correcting for the problem. That is one interpretation of that plan. So what difference do we owe the plan administrator? You owe them a highly deferential standard of abusive review, taking into account ñ They are under a conflict of interest, right? Yes. How much weight do we give that? In this case, minimal, if no weight at all. The district court got this one right. Alyeska is not UNUM. There was discovery on this issue. There was no evidence of malice, self-dealing, a parsimonious claims-granting history. I'm talking about one person who applied for benefits and was denied. Is there any claims history here in any direction? There is. There's no evidence one way or the other, as I understand it. Well, the plan administrator has been consistent in that they have never given benefits to someone else. Well, if anybody ever asked. Right. The Victoria Hampton declaration in the excerpts of record says that there was only one other claim denied that she recalled, and it was not an entirely separate issue. And it wasn't about this. Right. So he hasn't been consistent. We have no idea whether ñ I mean, it just hasn't happened. They've been consistent in the sense that they have paid thousands of individuals who were employees benefits. But is there any evidence that anybody in this situation, i.e., not on the payroll, but at least quite arguably and probably a common-law employee, applied under the 1989 plan? Is there any evidence of such a person? No. Okay. So the answer to my first question was there is no evidence one way or the other. So nobody thought that they were entitled to it who was a ñ worked for one of these temp agencies. We can infer, because nobody else made a claim. Absolutely. You can make that inference. And the plan administrator did not change the language in the plan because somebody came forward and said, I'm eligible, I deserve a pension. They changed it because of developments in case law. And, again, to make crystal clear that wages are wages paid by Alyeska, from which Alyeska contemporaneously withheld wages. How common is this kind of arrangement to use somebody for extended period with Alyeska, to use somebody who's doing work that ñ a material worker or a trash collector or even janitorial services. I can see you sort of bringing a contractor or mowing the lawn or, you know, a garden or something like that. This is somebody who held various jobs in the organization or functionally indistinguishable from other employees, and yet his paycheck comes from this third party. And I'm just wondering how common that is. Do we know? Does the record reflect anything about this? The record doesn't reflect anything about this. And you are in Alaska. It is a place of seasonal jobs. There are contractors employed for ñ But he wasn't seasonal, and he was hired, as I understand it, by Alyeska, who then said you should ñ you're going to get paid by these other people. That is his assertion. Right. But that's all we have at this point. Okay. And I wanted to reserve a minute. I see I have about four seconds. No, you don't. Actually, it's in the negatives. But we'll see what we can do. Thank you very much. Okay. We'll hear from the other side. May I please the Court? My name is George Freeman, and I'm privileged to represent Wendell Rankine in this appeal. I had some prepared remarks, but the questions have, I think, raised some issues that I need to address or should address right away. The first question is on the level of deference. I think, Your Honor, if you will look at the Salamoa case that synthesized the various levels of deference and consideration. This case, I'm sorry? Salamoa. We cited it in our opening brief, but forgot to list it in the list of cases. You were trying to answer my question. You keep getting diverted. Yes, I know. I'm sorry. So why don't you just give an answer to the question, and then you can give whatever citations you want. All right. Do you want to answer the question or do you not want to answer? The answer to the question, I appreciate Your Honor's guidance. You ought to be getting diverted again. Just stop doing it and just give an answer. On the level of deference, when there is a structural conflict of interest, regardless of this so-called level of conflict. You're doing it again. Just tell us what level of deference. The deference is the decision reasonable, and when you're interpreting a plan, if you look at the Anderson case or Judge Posner's decision in the Call case in the Seventh Circuit. You're doing it again. Well, I'm sorry, Your Honor. Do you remember the question? The question is the level of deference, and I'm trying to answer that question. Don't give us citations. Don't give us citations like that. What level of deference? The level of deference in the interpretation of the plain meaning of language in a plan is extremely limited. What the administrator can do, if the administrator interprets plain language in a way that is inconsistent with the terms of the plan, then that is an unreasonable decision. That's an arbitrary and capricious decision. Salamoa said that any reasonable basis test is out when you have a structural conflict of interest. You are left with this. A higher degree of skepticism is appropriate. Yes, that's what Salamoa said. It doesn't say it's out. It says a higher level of skepticism. No. There's a distinction there, Your Honor. I'm sorry to disagree with you, but there's a distinction there. They are urging that any reasonable basis test applies. Salamoa says if there's a structural conflict of interest, then any reasonable basis test is out and they are limited to whether or not their decision is reasonable. Skepticism is applied. What's the difference between any reasonable basis and reasonable? Well, apparently, the aliaska thinks that the any reasonable basis test that is articulated in Montour is a sort of license to if we can come up with anything that makes this thing fly, we win. Look, we are… I've got Salamoa here. Can you tell me where? Do you see this? Salamoa? Yeah, I've got it. When are you going to come? Do you have the… Well, the one that I have, the revised decision, says right after order on the first page, this quote, any reasonable basis test… What page is that? What page? 667. 667, okay. 667 is a bunch of head notes. It's the very beginning of the decision. I'll tell you what. It's an order that has… The opinion doesn't actually start until page 668. According to… Well, this is a case that cites Salamoa. It's a land fee versus a prudential insurance company. It says, in Salamoa, the ninth circuit synthesized post-divided cases into a workable rule. The Salamoa court began by explicitly overruling the, quote, relied on by prudential in their motion for summary judgment. And they cite pages 673 through 74. Okay, I'm looking at 673, and that's the standard review. So you don't have specific language. You don't really have the case there, right? I disagree. You do have the case? On the standard review? Well, I'm looking at the standard review. I mean, you gave me a bunch of pages. I'm looking for language. Do you have the case there? Are you looking at the bottom of 673 and the beginning of 674? I am. This any reasonable basis, this is in Salamoa, this any reasonable basis test is no longer good law In this case, the administrator operates under a structural conflict of interest? Certainly doesn't say that there. There's a discussion of that much further in the case, and it's quite a bit more nuanced. Are you by footnote 10? Footnote 10, okay. It's a little odd because I have two footnote 2s. Footnote 10 is 947, 5th 2nd, 1412. Right, and if you go just below that in the text, after the references to Horn and Snowages, the sentence reads, quote, this any reasonable basis test is no longer good law when, as in this case, an administrator operates under a structural conflict of interest. Do you see that language? Right. Thank you. So that's your language? Yes. It is cited in other decisions in the Ninth Circuit. Right. So that means that the any reasonable basis test is not good law, but it doesn't tell us what the level of deference is that we do owe. Well, it's important to make this distinction because what you're going to be determining is, is the decision reasonable there under Anderson? Well, let me back up for a minute. Go ahead. Has the plan itself and its opinions ever explained, I mean, it has asserted that this sentence refers to people on the payroll, I mean, in its actual written explanations, but they never explain how it got there or why it said that. What, in their briefing? No, not in the briefing. Well, in their decision-making. Right, in their decision-making. Their two decisions don't really say anything about it. They simply assert that he's not covered by it. One of them starts, you're not being very helpful in general. Could you tell me what the decisions actually say? The first decision says we've amended the plan 10 and 12 years later and you're out. The second decision reiterated that and asserted that. And essentially read those back into the 89 plan. Correct. Is there, is it common ground that it's the 89 plan now, that it's the 89 plan's language that is governing, whatever it means, and governing all the way up because otherwise there would be a retroactive change? Is that what's happening here? That's what we're asserting. Has that been contested by the defendants at this point? Are they contesting whether or not their amendments are changes? No. Are they contesting whether or not if the amendments were changes they would not apply to him? I think what they're saying is that they were not changes. I know that's what they're saying. I'm asking you a different question. Are they asserting that if the language in the 1989 plan means what you say it means, that it is that language that governs his right to benefits as of today and as of the entire period? Well, I think that the language does cover his right to benefits. I understand. I'm sorry. Maybe I'm not getting it. No, you're not. I'm sorry. I apologize. So Alyeska's counsel suggests that this language in the 1989 plan is inherently ambiguous because it must reasonably be understood as applying to Alyeska's direct employees. And if this language is inherently ambiguous, or maybe they're saying it's clear, but I'm saying if it's inherently ambiguous, then why wouldn't we defer to the plan's interpretation in this context? I don't think that's any reasonable basis issue. That's just, is it a permissible interpretation of this language that the plan administrator views as discretion? First of all, Your Honor, the – Why don't you speak into the mic? I'm sorry. I'm sorry. Maybe that will help you hear me. The question is – We have the question. Why don't we start with an answer? All right. The answer to the question is they never asserted that it was ambiguous at the administrative level or the – Well, asserted didn't mean that. That's equivalent to saying it's ambiguous. You're saying it means one thing. They're saying it means another thing. That seems to me to be an assertion that it doesn't mean what you're saying it means. So it's – Okay. Let's just say that I'm saying it's ambiguous. All right. The aliaska says we think the language is plain. We look at the word for. You're saying we think the language means something else. So I have to make a decision. If I determine this is an ambiguous section, why doesn't the plan administrator then win? I just defer to the plan administrator. First of all, it is our view that the plan administrator did not exercise discretion and assert that it was ambiguous. As a result, there would be a de novo review of that point, and Microsoft says that the rule, contraproferentum rule, would apply. That is, you construe it against the drafter. The assertion that the – What is your position that the plan provision doesn't say anything about the person having to be in the payroll of aliaska? That's right. And, moreover, it has a least employee exception, which would be completely superfluous, and our case law actually says that you're not supposed to have superfluous things in plans. Is that your answer? All right. If you would answer, you would have to get an answer from somebody else. Your Honor, I – Stand in front of the mic and answer the question. I guess you can tell this is my first nine-circuit argument. I apologize for my inadequacies. The – what I was about to launch into is – the standard here is the administrator is required to interpret the plain language and cannot add terms to the language. What the administrator is trying to do here is to add language, to add paid by aliaska on the payroll. The plain language of the plan does not include those terms. And I did want to address something about 3121. 3121 is a common law employee standard or status regulation – statute. 3121 speaks about the status of the person receiving the money for wages and the type of services that he or she performs. This plan was seeking to obtain tax qualification and ERISA status for its plan. And 2.16, the purpose of it, in our view, is to make sure that the reader knows that it covers common law employees and not independent contractors. How about the argument that if the plan meant what you said it meant, then the plan administrator would have no idea how many employees were eligible for pension benefits. So there would really be no way to ensure that the assets were adequate. Well, I think that is addressed in part in a footnote in the Burry case, where the court that I served had said, Judge Kaczynski was on that panel, and I'm sure you'll remember this, that… I can't say it by heart. I can't, so please go ahead. Where they said that that is not, with all due respect, that is not a consideration in this context. And to say they didn't know who these people were, I think, is incorrect. When we were addressing the issue of the conflict below, we pointed out the number of people that were in Mr. Rankin's position, and I think they knew who they were. Okay, thank you. And I've gone over my time, I suppose. Thank you, Your Honor. Want to take a minute for a vote? I have one question, which is you had said that the surpluses rule, essentially, doesn't apply here, and my understanding is that we have case law that specifically says it does. The Brown case and others, no? Yes, my response to that, Judge Berzon, would be that what this plan is trying to do is to make very clear to the person of average intelligence… So you're saying it doesn't apply? It doesn't apply in these particular circumstances. Which are no different than any other circumstances in a plan. Well, but the question is, ultimately, was the plan administrator's interpretation reasonable? Not was it the most persuasive interpretation or, indeed, the only interpretation, but that it was not unreasonable to say that someone who was not paid by Alieska was not an employee eligible for a commission. What is a leased employee? A leased employee is someone who is not a common law employee and then still meets the remaining factors of 414N in the tax code. That means nothing to me. What would be an example of a leased employee? Well, that is what the court has said it means, and I can't come up with an example. So Mr. Rankin would be a leased employee if it were determined that he wasn't a common law employee, correct? And if he met the remaining standards that he was under the direction and control of 414N. But it has never been the position of the administrator here that he is a leased employee? Correct. Presumably.  Would you have the opportunity to demonstrate this? Essentially, there has been a remand, I gather, to decide what? Yes, if you look at the judgment, it simply says it is a remand for the issue of entitlement to pension benefits and entitlement to separation benefits. So the plaintiff had asked for a judgment in the district court that he was so entitled, and the district court didn't give him that under concrete, so it needs to go back to the plaintiff's administrator to make that decision in the first instance. So does the district court need to determine whether if we help that, if we affirm the district court, would there still need to be a determination whether Mr. Rankin was a common law employee? Is that something the district court would have to decide? No, that's something that the plaintiff's administrator would decide in the first instance. Is that because in Bury, didn't it go back to the district court to make that decision? My understanding of concrete says the remand should be to the plaintiff's administrator. Okay. Are there no further questions? And I gather that Aliesca wants it that way. That is, you're not conceding that he was a common law employee. Correct. Okay. Thank you. Thank you. The case is hired. We'll stand some note.
judges: Kozinski, Berzon, Ikuta